IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| JAMES L. COOPER, III, an individual, MARTIN COWEN, an individual, and the GEORGIA GREEN PARTY, an unincorporated political body, | * * * * * * | Civil Action No. 1:20-cv-1312-ELR |
| Plaintiffs, | * * | |
| v. | * * | |
| BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State, | * * * * | |
| Defendant. | * | |

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Defendant Brad Raffensperger, Georgia Secretary of State ("the Secretary"),

responds to Plaintiffs' Motion for Preliminary Injunction as follows.

## INTRODUCTION

Plaintiffs' lawsuit is the most recent in a series of attempts to overturn

Georgia's ballot access requirements for political body candidates, this time under

the pretext of the public health emergency due to COVID-19.[1] Despite numerous

---

[1] The related case of *Cowen, et al. v. Raffensperger*, No. 1:17-cv-04660-LMM (N.D. Ga. Sep. 23, 2019) (*See* Doc. 11-18), also involving Plaintiff Martin Cowen,

attempts to have Georgia's petition requirements enjoined, however, courts repeatedly have upheld the requirements as constitutional. *See, e.g., Jenness v. Fortson*, 403 U.S. 431 (1971); *Cartwright v. Barnes*, 304 F.3d 1138 (11th Cir. 2002); *Coffield v. Handel*, 599 F.3d 1276 (11th Cir. 2010).

Based on this controlling precedent, the Court's determination of Plaintiffs' request for injunctive relief must start with the assumption that Georgia's petition requirements are facially constitutional. The only issue to be determined, then, is whether the intervening public health emergency caused by COVID-19 requires the Court to enjoin the state's otherwise constitutional petition requirements in their entirety. Plaintiffs have not demonstrated that such extraordinary relief is warranted.

To be sure, the COVID-19 outbreak has presented a challenge for election officials, candidates, and voters alike. However, to alleviate these burdens, the Secretary extended the deadline an extra 31 days for political bodies and their candidates to submit nomination petitions. This extension gives aspiring candidates a total of 7 months to conduct a signature campaign. With this amount of time, Plaintiffs cannot show that Georgia's petition requirements, even in the context of the current public health emergency, impose a severe burden on their constitutional

is currently on appeal to the Eleventh Circuit Court of Appeals following a grant of summary judgment in favor of the Secretary of State.

rights that outweighs the State's recognized interest in requiring that candidates show a "significant modicum of support" as a pre-condition for ballot access. *See Jenness*, 403 U.S. at 442.

For these reasons, and those discussed further below, the Secretary respectfully requests that the Court deny Plaintiffs' motion to enjoin Georgia's petition requirements for political body candidates in their entirety. Alternatively, the Secretary asks that the Court fashion a remedy that reduces the petition signature requirement, for the November 2020 general election only, in proportion with the added burdens associated with COVID-19, taking into account the 31-day extension already granted by the Secretary. Such a remedy would be proportionate with the alleged harm, equitable to all candidates who will be on the ballot in the general election, and consistent with remedies fashioned by courts in similar cases in other states.

## FACTUAL BACKGROUND

### I.   Georgia's Ballot Access Laws

Georgia's election code provides for ballot access based primarily on a showing of support within the electorate.[2] A "political party," for example, is defined

---

[2] Candidates must also file a notice of candidacy and qualifying fee. O.C.G.A. § 21-2-132(d). The qualifying fee must be paid by all candidates—whether political party, third party, or independent.

under Georgia law as a political organization whose nominee received at least 20% of the vote in the last gubernatorial or presidential election. O.C.G.A. § 21-2-2(25). Based on that substantial showing of support, political parties may obtain ballot access by nominating a candidate via primary election. O.C.G.A. § 21-2-130(1). Currently, only the Republican and Democratic parties meet this definition.

The Green Party and the Libertarian Party are "political bodies" under Georgia law, which is defined as any political organization that does not meet the definition of a "political party." O.C.G.A. § 21-2-2(23). Political body candidates do not have to win a majority of votes in a primary election or expend resources running a primary campaign to be nominated for the general election ballot. Rather, political body candidates may be nominated at their organization's convention, and included on the general election ballot by demonstrating voter support in other ways.

For *statewide* offices, a political body can qualify to have its nominees appear on the general election ballot by submitting a qualifying petition signed by at least 1% of the total number of registered voters at the last general election; or (b) nominating a candidate for statewide office who received votes totaling at least 1%

of the total number of registered voters at the last general election. O.C.G.A. §§ 21-2-170(b); 21-2-180.[3]

For *non-statewide* offices, including Georgia's Congressional districts, political body candidates may appear on the general election ballot if they submit a nominating petition signed by 5% of the number of registered voters eligible to vote for that office in the last election. O.C.G.A. § 21-2-170(b).

Finally, O.C.G.A. § 21-2-170(b) provides that political-body candidates for *president* must submit a nominating petition signed by at least 1% of the total number of registered voters at the last general election. However, that statutory requirement was reduced to 7,500 signatures by court order in 2016, as the result of a prior challenge by the Green Party. *See Green Party v. Kemp*, 171 F. Supp. 3d 1340, 1372 (N.D. Ga. 2016) *aff'd* 674 Fed. Appx. 974 (11th Cir. 2017).

Georgia law places very few restrictions on the signature-gathering process. Candidates have 180 days (six months) to collect signatures. O.C.G.A. § 21-2-

---

[3] In 1988, the Libertarian Party qualified under O.C.G.A. § 21-2-180 to nominate candidates for statewide offices when it submitted a qualifying petition signed by more than 1% of the total number of registered voters in the preceding general election. Since then, the party has retained that qualification in each election cycle by nominating at least one candidate for statewide public office who received votes totaling at least 1% of the total number of registered voters in that election. However, the Libertarian Party is still required to meet the petition requirements for ballot access for non-statewide offices under O.C.G.A. § 21-2-170.

170(e). Since the nomination petition is due by the second Tuesday in July (this year, July 14), aspiring candidates in 2020 or their political body organizations could have begun gathering signatures as early as mid-January. O.C.G.A. § 21-2-132(e). Candidates are not required to wait until after they receive their party's nomination to begin gathering signatures. And unlike most states' more burdensome rules, which often restrict voters from signing more than one petition, the only restriction on signing is that no person may sign the same petition more than once. O.C.G.A. § 21-2-170(c).

## II.   Plaintiffs' Prior Attempts to Seek Ballot Access.

Plaintiffs are no strangers to Georgia's ballot access requirements—both individual plaintiffs and the Georgia Green Party have attempted to qualify for the general election ballot in Georgia in the past and have been involved in prior litigation challenging Georgia's petition requirements.

Mr. Cooper previously attempted to qualify for the general election ballot in 2018 as the Green Party candidate for Georgia's Eighth Congressional District. (*See* Doc. 11-19, at 37 ¶ 96.) He attempted a petition drive but only "gathered 171 signatures in January and February 2018 before abandoning his efforts." (*Id.*)

Mr. Cowen previously attempted to qualify for the general election ballot in 2018 as the Libertarian Party candidate for Georgia's Thirteenth Congressional

District. (*See* Doc. 11-19, at 35 ¶ 93.) By his own account, he attempted a petition drive over a period of 40 days (out of the permissible 180), but only collected 620 signatures. (*Id.*)

Mr. Cowen is also the named plaintiff in prior litigation against the Secretary seeking to enjoin Georgia's petition requirements for political body candidates for U.S. House of Representatives. (*See* Doc. 11-18 [summary judgment order in *Cowen, et al. v. Raffensperger*, 1:17-cv-04660].) In that action, Mr. Cowen advanced many of the same arguments made here—namely, that Georgia's petition requirements present a severe burden on candidates' voting and associational rights in violation of the First and Fourteenth Amendment. This Court, however, granted summary judgment in favor of the Secretary based upon controlling Supreme Court and Eleventh Circuit precedent upholding the constitutionality of Georgia's petition requirements. (*See id.* at 15.) As discussed further below, that precedent is also controlling here.

The Green Party has also sought reduction of Georgia's petition requirements for presidential candidates in prior litigation. *See Green Party*, 171 F. Supp. 3d at 1344. In that action, the court reduced the signature requirements to 7,500 for presidential candidates "until the legislature imposes a permanent requirement." *Id.* at 1373. However, the legislature has not enacted any such changes to the election

code since the *Green Party* decision in 2016. Despite the reduction in the signature requirement, the Green Party still did not qualify a candidate for the ballot in Georgia in the 2016 presidential election.

### III.   The Secretary's Response to COVID-19 in the 2020 Election Cycle.

On March 14, 2020, following the outbreak of COVID-19, Governor Kemp declared a public health state of emergency in the State of Georgia. (*See* Doc. 11-6.) On April 2, Governor Kemp issued a temporary "shelter in place order," which eventually concluded (except as to the most at-risk individuals) by April 23. (*See* Doc 11-8.) The Governor's public health state of emergency is currently scheduled to expire on June 12, 2020. (*See* Doc. 11-9.)

On the same date as the Governor's declaration of a public health state of emergency, the Secretary began taking significant steps to alleviate the impact of COVID-19 on Georgia's election process for the 2020 election cycle. First, he postponed Georgia's presidential preference primary and general primary to June 9. (Harvey Dec. ¶ 8, attached as Exhibit 1). Next, the Secretary mailed absentee ballot request forms to Georgia voters statewide, and implemented social distancing measures in polling places for the primary election. (*See* Doc. 11-11.)

Finally, and most relevant here, the Secretary sent notice to all third-party and independent candidates who filed a declaration of candidacy and qualifying fee that

the deadline for submitting nominating petitions would be extended to August 14, 2020. (Harvey Dec. ¶ 12.) This extension increased the signature-gathering period from 180 to 211 days, in order to account for the difficulties candidates would face in gathering signatures due to COVID-19.  (*Id.*)

The August 14 deadline is the longest period of time the deadline can be extended and still allow time for signatures to be verified before the November ballots need to be finalized. (Harvey Dec. ¶ 13.) Georgia's elections are governed by strict timelines to ensure that military and overseas voters receive ballots in time to vote in each election. (*Id.* ¶ 9.) Federal law requires absentee ballots to be sent to overseas and military voters no later than 45 days prior to any election. *See* 52 U.S.C. § 20302(a)(8). Ballots have to be built, proofed, and printed, and then mailed starting at 49 days prior the November 3, 2020 general election in order to meet the 45-day deadline (by September 19, 2020) under federal law to send ballots to military and overseas voters. (Harvey Dec. ¶ 9.)

Once the Secretary of State's office receives the nomination petitions, the signature pages are sent to the appropriate counties to verify the voters' identities and signatures. (Harvey Dec. ¶ 13.) This is a time-consuming process, and the August 14 deadline only gives counties approximately two weeks to complete it before they need to begin building the ballots. (*Id.*) After the signatures on

nominating petitions are verified, any political body or independent candidates that qualify for the general election will be placed on the general election ballot. (*Id.* ¶ 14.)

Accordingly, elections officials must have the final candidate names for the general election ballot by August 28, 2020, in order to build and proof ballot databases so that absentee ballots can be printed and sent to overseas and military voters by the federal deadline. (Harvey Dec. ¶ 10.) This is an aggressive schedule for these activities, but achievable. However, any further delay endangers Georgia's compliance with federal law and the opportunity for military and overseas voters to participate in the November general election. (*Id.*)

## **STANDARD OF REVIEW**

A preliminary injunction in advance of trial is an extraordinary measure. *United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir. 1983); *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). For that reason, plaintiffs have the burden of establishing their entitlement to a preliminary injunction. *Citizens for Police Accountability Political Comm. v. Browning*, 572 F.3d 1213, 1217 (11th Cir. 2009). In order to prevail on a motion for preliminary injunction, the movant must show: [1] a substantial likelihood of prevailing on the merits; [2] that the plaintiff will suffer irreparable injury unless the injunction issues; [3] that the threatened

injury to the movant outweighs whatever damages the proposed injunction may cause the opposing party; and [4] the injunction would not be adverse to the public interest. *Duke v. Cleland*, 954 F.2d 1526, 1529 (11th Cir. 1992); *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988).

A preliminary injunction is a drastic remedy "which should not be granted unless the movant clearly carries the burden of persuasion." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 573 (11th Cir. 1974). Moreover, in election cases, the burden imposed on plaintiffs is higher still and increases as an election approaches. *See Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006); *see also Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008). Because Plaintiffs cannot meet any of the preliminary injunction factors here, their motion should be denied.

## ARGUMENT

### I.   Plaintiffs are Not Likely to Prevail on the Merits.

Plaintiffs cannot show a substantial likelihood of success on the merits of their claim because long-standing precedent has upheld the constitutionality of Georgia's nomination petition requirements under similar challenges. *See Jenness v. Fortson*, 403 U.S. 431 (1971); *McCrary v. Poythress*, 638 F.2d 1308 (5th Cir. 1981); *Cartwright v. Barnes*, 304 F.3d 1138 (11th Cir. 2002); *Coffield v. Handel*, 599 F.3d 1276 (11th Cir. 2010). Therefore, the Court's analysis of the Plaintiffs' claims must

start with the premise that Georgia's petition requirements are facially constitutional. To the extent that the intervening public health emergency has impeded Plaintiffs' petition efforts, those burdens have not been caused by any actions attributable to the Secretary, who has acted within the scope of his authority to alleviate any such burdens. Moreover, any added burdens due to COVID-19 are not outweighed by the State's important interest in requiring candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot.

### A. Georgia's petition requirements are constitutional under Supreme Court and Eleventh Circuit precedent.

The Supreme Court first upheld Georgia's 5% signature requirement for nomination petitions for Georgia's Congressional districts, which are challenged by the individual plaintiffs here, in the *Jenness* decision. In that case, the Court held that nothing in Georgia's requirements "abridges the rights of free speech and association secured by the First and Fourteenth Amendments." 403 U.S. at 440. The Court looked at the burden imposed by the 5% petition requirement and reasoned that, although it is "somewhat higher" than other states, Georgia imposes few restrictions on the signature collection process. *Id.* at 442. Specifically, voters may sign a petition for more than one candidate; voters are not required to state that they intend to vote for that candidate in the election; and voters who previously voted in a party primary are still eligible to sign a petition. *Id.* at 438-39. Additionally,

Georgia law does not fix an unreasonably early filing deadline for candidates and allows them 6 months to conduct a signature-gathering campaign. *Id.* at 438.

The Court next looked at the state's interest, acknowledging that there is an "important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, even frustration of the democratic process at the general election." *Id.* at 442. Weighing this important interest against the burden imposed by the 5% petition requirement, the Court concluded that any resulting burden was "balanced by the fact that Georgia has imposed no arbitrary restrictions whatever upon the eligibility of any registered voter to sign as many nominating petitions as he wishes." *Id.*

Since *Jenness*, the Eleventh Circuit also has upheld Georgia's 5% petition requirement in three separate decisions. *See Coffield v. Kemp,* 599 F.3d 1276, 1277 (11th Cir. 2010) (upholding dismissal of a challenge to the 5% petition requirement by an independent candidate for Congress because "[t]he pertinent laws of Georgia have not changed materially since the decisions in *Jenness* and *Cartwright*"); *Cartwright v. Barnes*, 304 F.3d 1138 (11th Cir. 2002) (finding that the Supreme Court's reasoning in *Jenness* "still equally pertains today"); *See also McCrary v. Poythress*, 638 F.2d 1309, 1312-13  (5th Cir. 1981) (holding based on *Jenness* that

Georgia's 5% petition signature requirement does not violate the First and Fourteenth Amendment). And, as noted above, this Court recently rejected a challenge seeking to enjoin the 5% petition requirement for Congressional candidates in the related action of *Cowen, et al. v. Raffensperger*, 1:17-cv-04660. (See Doc. 11-18, at 15) ("The Court is bound by the clear rulings of both the Eleventh Circuit and the Supreme Court").

With respect to the petition requirement for presidential candidates, while the 1% signature requirement required under O.C.G.A. § 21-2-170(b) has been reduced by judicial decision, the Eleventh Circuit reviewed and affirmed that order setting the petition requirement for presidential candidates at 7,500 "until the legislature imposes a permanent requirement." *See Green Party of Georgia v. Kemp*, 171 F. Supp. 3d 1340, 1373 (N.D. Ga. 2016), *aff'd* 674 Fed. App'x 974 (11th Cir. 2017). This judgment necessarily holds that such a requirement is not unconstitutionally burdensome, and balances the rights of political body candidates against the state's interests. *Id.* Thus, while this order was based on a judgement that the *previous* requirement was unduly burdensome, that does not and cannot mean that the imposed remedy (still presently in effect) is constitutionally infirm.

14

**B. Even under the *Anderson-Burdick* framework, Georgia's petition requirements are not unconstitutionally burdensome.**

Plaintiffs' motion completely ignores the *Jenness* decision, the Eleventh Circuit precedent cited above, and this Court's recent order in the *Cowen* case rejecting a related challenge. Instead, Plaintiffs urge this Court to analyze their claim anew under the *Anderson-Burdick* balancing test. (*See* Doc. 11, at 23.) Under this test, courts are to employ a flexible standard that weighs the "character and magnitude of the asserted injury" against the state's asserted interests. *Anderson v. Celebreeze*, 460 U.S. 780, 789 (1982). Heightened scrutiny should be applied where the injury is greater. *See id.* But where only "reasonable, nondiscriminatory restrictions" are involved, a state's regulatory interests are generally sufficient. *Id.* at 788. *See also Burdick v. Takushi*, 504 U.S. 428, 434 (1992).

Controlling precedent notwithstanding, even under the *Anderson/Burdick* framework, Plaintiffs still cannot show that the State has imposed any *new* burdens on their voting and associational rights under the First and Fourteenth Amendment. As an initial matter, Plaintiffs have not identified any actual "state action" required to assert a claim under Section 1983. Rather, Plaintiff's alleged burdens have been caused by the COVID-19 virus, which is wholly outside of the state's control. Furthermore, Plaintiffs cannot show that any burden on their ability to conduct a signature gathering campaign is severe enough to outweigh the state's significant

15

regulatory interests in managing its elections and keeping frivolous candidates off of the ballot.

1.  *The asserted burden on Plaintiffs' petition efforts is due to COVID-19 and not the result of restrictions imposed by State election laws or policy.*

In order to state a claim under 42 U.S.C. § 1983, Plaintiffs must show "the violation of a right secured by the Constitution and laws of the United States," and "that the alleged deprivation was committed by a person acting under color of state law." *Cummings v. DeKalb County*, 24 F.3d 1349, 1355 (11th Cir. 1994). Accordingly, Plaintiffs are required to point to some statute, regulation, or policy enforced by the Secretary that has interfered with their recognized rights. Plaintiffs have not identified any offensive statutes or regulations other than the existing petition requirements already upheld as constitutional. Instead, Plaintiffs point to the public health risks associated with conducting a signature-gathering campaign as the source of their increased burden. (*See* Doc. 11, at 26-27).

However, this type of argument was recently rejected in an elections case seeking to require the Secretary to implement a number of changes to Georgia's election procedures due to COVID-19. This Court dismissed the action based in part on the lack of any state action that burdened the plaintiffs' voting rights:

> The real problem here is COVID-19, which all but the craziest conspiracy theorists would concede is not the result of any act or failure by the government. And that fact is important when weighing the

16

Defendants' management of the election. Specifically, ***this is not a case in which the state applied its own policy, adopted a rule, or enacted a statute that burdened the right to vote***. In other words, this is not *Burdick or Takushi*, 504 U.S. 428 (1992), or *Anderson v. Celebrezze*, 460 U.S. 780 (1983). The former involved an Ohio statute that imposed an early filing deadline for independent candidates; the latter involved Hawaii's state-imposed policy against write-in voting. ***Here, the underlying burden on the right to vote emanates from a virus, which obviously was not created or imposed by Defendants.*** While Plaintiffs contend the Defendants have done a poor job of responding to that virus, the fact that the virus's provenance was not through Defendants further increases, in this Court's opinion, the impropriety of judicial intervention. All of the election cases cited by Plaintiffs in which injunctive relief was granted involved a burden on the right to vote that was created by the Government. Not so here.

*Coalition for Good Governance, et al. v. Raffensperger, et al.*, Civil Action No. 1:20-cv-01677-TCB, slip op. at * 10 n. 2 (N.D. Ga. May 14, 2020) (emphasis added).[4]

As correctly noted in that decision, the *Anderson-Burdick* analysis has not been applied outside the context of specific state action, and Plaintiffs have not cited to any cases holding otherwise. This is fatal to Plaintiffs' Section 1983 claim, and warrants denial of Plaintiffs' motion.

> 2. *Georgia's petition requirements do not impose a severe burden on candidates, and the Secretary has taken steps to mitigate any additional burdens imposed on Plaintiffs due to COVID-19.*

Even if Plaintiffs could point to some state action that has imposed new burdens on their First and Fourteenth Amendment rights, Plaintiffs still must

---

[4] The *Coalition* slip opinion is attached as Exhibit 2.

demonstrate under *Anderson-Burdick* that the petition requirements impose a burden that is outweighed by the State's interests. Plaintiffs cannot make this showing.

In assessing the severity of the burden imposed by Georgia's petition requirements under the *Anderson-Burdick* framework, the Court's analysis must start with the recognition that the Supreme Court and the Eleventh Circuit have held that Georgia's petition requirements do not present a severe burden and are not subject to heightened scrutiny. *See, e.g., Jenness*, 403 U.S. at 442; *Anderson*, 460 U.S. at 788 (citing Georgia's petition requirements as an example of "reasonable, nondiscriminatory restrictions" that are justified by the "state's important regulatory interests"); *McCrary*, 638 F.2d at 1312-13.

Indeed, the Supreme Court has expressly rejected Plaintiffs' argument that petition requirements such as Georgia's are subject to strict scrutiny. Noting that "[e]lection laws will invariably impose some burden upon individual voters," the Court in *Burdick* rejected the argument that "a law that imposes any burden on the right to vote must be subject to strict scrutiny." 504 U.S. at 433.  Such a result "would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id.*

Accordingly, relying on *Jenness*, *Anderson*, and *Burdick*, the Eleventh Circuit and other courts consistently have held that state petition requirements for ballot

access are reasonable, non-discriminatory restrictions that impose minimal burdens on the rights of candidates, and are justified by a state's regulatory interests. *See, e.g., Libertarian Party of Fla. v. Florida*, 710 F.2d 790, 793 (11th Cir. 1983) (upholding Florida's 3% petition requirement and declining to apply a heightened level of scrutiny); *Swanson v Worley*, 490 F.3d 894, 903-904 (11th Cir. 2007) (upholding Alabama's 3% petition requirement); *Ariz. Libertarian Party v. Hobbs*, 925 F.3d 1085, 1093 (9th Cir. 2019) (holding that a state can allow signature requirements of up to 5% without imposing a "severe burden" triggering heightened scrutiny); *Libertarian Party of N.H. v. Gardner*, 843 F.3d 20, 26 (1st Cir. 2016) ("Neither the Supreme Court nor any circuit court has struck down a statewide ballot-access regime on the grounds that a signature requirement of 5% (or less) is too much, or that 6 months (or more) is too little time within which to gather the signatures from a pool of substantially all voters."); *Rainbow Coalition of Okla. v. Okla. State Election Bd.*, 844 F.2d 740, 743 (10th Cir. 1988) (rejecting the argument that strict scrutiny should be applied in upholding Oklahoma's 5% petition requirement for party status).

Plaintiffs cite a number of recent decisions in which other courts have found that, due to COVID-19, state petition requirements should be analyzed with a heightened level of scrutiny. However, in all of those cases, the petition deadlines

19

fell during or shortly after state-imposed shelter-in-place orders, where the signature-gathering process would have been more severely burdened. *See, e.g,* *Faulkner v. Virginia Dep't of Elections et al.*, No.: CL 20-1456, slip op. at 2 (Va. Cir. Mar. 27, 2020) (deadline fell less than two weeks after state of emergency was declared); *Warren v. Griswold*, No. 20CV31077, slip op. at 1  (Colo. Dist. Ct. Apr. 21, 2020) (deadline fell 7 days after state of emergency declared);[5] *Garbett v. Herbert*, No. 2:20-cv-245, 2020 U.S. Dist. LEXIS 75853 at *5-7 (D. Utah Apr. 29, 2020) (deadline fell during "stay at home" order which had been in place for two weeks, and a state of emergency in place for a month); *Esshaki v. Whitmer*, No. 2:20-CV-10831-TGB, 2020 U.S. Dist. LEXIS 68254 at *2 (E.D. Mich. Apr. 20, 2020) (deadline fell during stay-at-home order that had been in place for a month); *see also* *Goldstein v. Secretary of the Commonwealth,* 142 N.E.3d 560, 568 (Mass. 2020) (deadline would fall during the "stay-at-home advisory" that had been in place for more than a month, and state of emergency in place for roughly two months); *Libertarian Part of Ill v. Pritzker*, No. 20-CV-2112, 2020 U.S. Dist. LEXIS 71563 at *4 (N.D. Ill. Apr. 23, 2020) (although the petition deadline fell in June, the

---

[5] The *Faulkner* slip opinion is attached as Exhibit 3. The *Warren* slip opinion is attached as Exhibit 4.

window for gathering signatures opened at nearly the same time as the state's "stay at home" order took effect and duration of order was unclear).

This is not the case here in Georgia. At most, Plaintiffs can point to the Governor's shelter-in-place order that was effective during the month of April as a time in which the government imposed additional burdens on Plaintiffs' ability to conduct a signature-gathering campaign. However, the Secretary has already increased the deadline for submitting nomination petitions by 31 days to account for this—more than the time the shelter-in-place order was in effect.

To be sure, the Secretary is not claiming that Plaintiffs should have jeopardized their health or the health and safety of others by conducting a public signature-gathering campaign between mid-March and April. However, the state has been in the process of reopening throughout the month of May, and there is still significant time remaining to gather the required signatures. Georgia designed a ballot access system permitting one of the longest signature gathering periods (if not the longest) in the nation. In this way, Georgia's system builds in ample time for political bodies to gather signatures, providing a cushion in case andidates lose days or weeks to unforeseen circumstances. While COVID-19 is certainly unprecedented, Georgia's signature-gathering period (even before the Secretary extended the

deadline and added days) is long enough to account for at least some days, or even weeks, lost.

Additional facts ameliorate the burden here or cast doubt on its severity going forward:

- Nearly two months of the original 180-day period (mid-January through mid-March) were unaffected by COVID-19 or any state related action.

- The Secretary's decision to extend the deadline to August 14 increased the total number of days from 180 to 211 during which candidates may gather signatures.

- As of the beginning of May, the Governor's shelter-in-place order is no longer in effect for most voters.

- Early voting for the primary is underway and voters will be voting at polling locations for the June 9th primary, where candidates can collect signatures as they previously intended (*see* Doc. 11-22, at 3), within legally permissible limits.

Thus, while the petition requirements may be more burdensome under the present circumstances than in the usual case, the somewhat condensed time period to meet the required numbers does not present the "severe" burden requiring a heightened level of scrutiny as Plaintiffs contend.

*3. The State still has an overriding interest in requiring candidates to make a preliminary showing of a significant modicum of support before placing their names on the ballot.*

Even acknowledging that there are some additional burdens placed on Plaintiffs' ability here to meet the petition signature requirements (due to a virus entirely outside of the State's control), those burdens must be weighed against the State's "undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot, because it is both wasteful and confusing to encumber the ballot with frivolous candidates." *Anderson*, 460 U.S. at 788 n. 9. *See also Jenness*, 403 U.S. at 442 ("There is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election."); *Cal. Democratic Party v. Jones*, 530 U.S. 567, 572 (2000) ( "in order to avoid burdening the general election ballot with frivolous candidacies, a State may require parties to demonstrate 'a significant modicum of support' before allowing their candidates a place on that ballot.").

The State furthermore has a generalized interest in the orderly administration of elections. *See Storer v. Brown*, 415 U.S. 724, 730 (1974) ("as a practical matter,

23

there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process").

These legitimate state interests have not become any less compelling due to COVID-19. The Secretary has already extended both the deadline for Plaintiffs to submit their nomination petitions and the total petitioning days allowed to account for any time lost during the Governor's shelter-in-place order. However, the state has strong interests in maintaining the previously-upheld petition requirements "in order to avoid burdening the general election ballot with frivolous candidates." *Jones*, 530 U.S. at 572. To permit Plaintiffs to be placed on the ballot without making *any* showing of a "modicum of support" among the electorate would severely undermine the state's interests and introduce confusion and chaos into the general election process.

In sum, based on controlling precedent upholding the constitutionality of Georgia's petition requirements, and assessing any new burdens associated with COVID-19 under the *Anderson-Burdick* framework, Plaintiffs cannot show a likelihood of success on the merits.

II.     **Plaintiffs Have Not Shown Irreparable Harm.**

To succeed under the second preliminary injunction factor, Plaintiffs must show "a substantial likelihood of irreparable injury" absent a preliminary injunction. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). As the Eleventh Circuit has emphasized, the asserted irreparable injury "must be neither remote nor speculative, but actual and imminent." *NE Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990). Here, Plaintiffs have not shown how their asserted rights will be irreparably harmed absent injunctive relief, other than a vague assertion that they will lose the opportunity to be candidates and voters will not have the opportunity to vote for them. (Doc. 11, at 30-31.)

However, it remains entirely speculative the Plaintiffs will not be able to meet the petition requirements with the extended deadline of August 14. Plaintiffs still have over two months (11 weeks) to gather signatures. In past efforts to gain ballot access, the individual plaintiffs admit that their signature-gathering campaigns were conducted over a much shorter period of time. (*See* Doc. 11-19, at 37 ¶ 96; Doc. 11-19, at 35 ¶ 93.) And although they fell far short of meeting the petition requirement in the prior election cycle, this is likely a reflection of the level of support they have among voters in their respective districts.

But even knowing that the petition requirements would require significant time and effort based on past experience, Plaintiffs failed to gather *any* signatures during the first two months of the 180-day period, from mid-January until the public health state of emergency declaration on March 14. Any resulting harm is therefore, at least in part, caused by Plaintiffs' own lack of reasonable diligence. *See Libertarian Party of Florida v. Florida*, 710 F.2d 790, 793 (11th Cir. 1983) (stating that the "focal point of this inquiry is whether a reasonably diligent candidate can be expected to satisfy the signature requirements") (citation omitted). Accordingly, Plaintiffs cannot establish that they will suffer irreparable harm, and this factor weighs against granting injunctive relief.

## III. The Balance of Equities and Public Interest Favors the Enforcement of Georgia's Ballot Access Requirements.

Courts in this district have considered the remaining two factors, balancing the equities and public interest, together in election cases. *See Curling v. Kemp*, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018). Both of these factors clearly weigh in favor of the Secretary.

Because States are "primarily responsible for regulating federal, state, and local elections," they have a "strong interest in their ability to enforce state election law requirements." *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011). *See also Esshaki*, 2020 U.S. Dist. LEXIS 68254 at *26 ("The Supreme

26

Court has consistently recognized that states have a strong interest in seeing their laws effectuated.") For this reason, the Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205, 1207 (April 6, 2020) (per curiam) (citations omitted).

As this Court has recently noted, there is "a public interest in the Court promoting certainty with elections and not entering orders that create 'voter confusion and consequent incentive to remain away from the polls.'" *Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registration & Elections*, No. 1-20-cv-00912-SDG, 2020 U.S. Dist. LEXIS 36702 at *28-29 (N.D. Ga. Mar. 3, 2020). Here, ballot access requirements serve the state's recognized interests in "in avoiding confusion, deception, and even frustration of the democratic process." *Jenness*, 403 U.S. at 442. Accordingly, the public interest weighs against enjoining the State's petition requirements.

## IV.    Plaintiffs' Proposed Remedy Seeks to Eliminate All Requirements for Ballot Access for Political Body Candidates.

As shown above, Plaintiffs' motion for a preliminary injunction should be denied because Plaintiffs failed to meet the requisite showing that the requested relief is warranted.

Alternatively, the Secretary requests that the Court partially grant Plaintiffs' motion and fashion a remedy that reduces the petition signature requirements of O.C.G.A. § 21-2-170(b), for the November 2020 general election only, by 30%. Such a remedy is appropriate for several reasons. *First*, it is proportionate to the asserted harm, and a 30% reduction would account for the approximately 60 days under which the State was under a declaration of a public health emergency (as currently set by the Governor's executive orders). That Plaintiffs ask the Court to eliminate the petition requirements entirely suggests that their motion is less about the health risks associated with COVID-19 and more about eliminating any and all restrictions to ballot access by third-party candidates.

*Second*, the proposed 30% reduction would be equitable to all candidates who will be on the ballot in the general election, while still respecting the State's interest in regulating ballot access. Plaintiffs seek to run candidates in contested Congressional districts, where members of both political parties will be nominated through a primary process. The political party candidates have faced the same burdens associated with campaigning during the current public health emergency, and still must undergo the statutory process of nomination through a primary election. It would be fundamentally inequitable for the State to maintain statutory

requirements for ballot access for one set of candidates, while waiving the statutory requirements entirely for Plaintiffs.

*Third*, the proposed reduction is consistent with remedies fashioned by courts in similar cases in other states, which have reduced—rather than eliminated—the challenged petition requirements. *See, e.g., Faulkner*, slip op. at 4 (reducing petition requirement for Republican candidate for U.S. Senate from 10,000 to 3,500 signatures); *Warren*, slip op. at 25 (reducing signature requirement by 50%); *Garbett*, 2020 U.S. Dist. LEXIS 75853 at *5-7 (reducing signature requirement by 32% to account for 33 lost days of petitioning); *Goldstein*, 142 N.E.3d at 575 (reducing signature requirement by 50%). This alternative remedy appropriately balances the burdens associated with COVID-19 and the State's interest in conditioning ballot access upon a showing of a significant modicum of voter support, unlike the Plaintiffs' proposed injunction, which would effectively eliminate all requirements for ballot access.

## **CONCLUSION**

For the foregoing reasons, the Secretary respectfully requests that the Plaintiffs' motion for preliminary injunction be denied, or granted in part with a 30% reduction of the petition requirements set forth in O.C.G.A. § 21-2-170, as outlined above.

Respectfully submitted, this 29th day of May, 2020.

CHRISTOPHER M. CARR
Attorney General                          112505

BRYAN K. WEBB                          743580
Deputy Attorney General

RUSSELL D. WILLARD              760280
Senior Assistant Attorney General

/s/ *Charlene S. McGowan*
CHARLENE S. MCGOWAN 697316
Assistant Attorney General

Office of the Georgia Attorney General
40 Capitol Square SW
Atlanta, GA 30334
cmcgowan@law.ga.gov
Tel: 404-656-3389

*Counsel for Defendant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing has been formatted using Times New Roman font in 14-point type in compliance with Local Rule 7.1(D).

/s/Charlene S. McGowan
Charlene S. McGowan
Assistant Attorney General

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day electronically filed the foregoing **DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following counsel for Plaintiffs via electronic notification:

Bryan L. Sells
bryan@bryansellslaw.com

Dated: May 29, 2020.

*/s/ Charlene S. McGowan*
Charlene S. McGowan
Assistant Attorney General
